

**FILED & ENTERED**

MAY 07 2024

**CLERK U.S. BANKRUPTCY COURT
Central District of California
BY** sumlin    **DEPUTY CLERK**

# UNITED STATES BANKRUPTCY COURT
# CENTRAL DISTRICT OF CALIFORNIA
# LOS ANGELES DIVISION

| | |
|---|---|
| In re:<br>Vistam, Inc.,<br><br>Debtor. | Case No.:  2:23-bk-12137-NB<br>Chapter:  11<br><br>**MEMORANDUM DECISION IMPOSING SANCTIONS UPON SELWYN D. WHITEHEAD AND BALTAZAR R. TAMAYO, JR.**<br><br><u>Evidentiary Hearing:</u><br>Date:  February 6, 2024<br>Time:  2:00 p.m.<br>Place: Courtroom 1545<br>         255 E. Temple Street<br>         Los Angeles, CA 90012<br>(and via ZoomGov) |

This Court issued an order (dkt. 139, the "OSC") directing the above-captioned Debtor's proposed counsel, the Law Offices of Selwyn D. Whitehead ("Ms. Whitehead"),[1] and Debtor's principal, Baltazar R. Tamayo, Jr. ("Mr. Tamayo"), to show cause why they should not be jointly and severally subjected to a compensatory civil contempt sanction of not less than $25,000.00, plus reasonable attorney fees and costs incurred by the SubChapter V Trustee M. Douglas Flahaut ("Trustee"), for transferring

---

[1] For ease of reference, unless the context requires, this Memorandum Decision does not distinguish between Selwyn D. Whitehead, Esq. and the Law Offices of Selwyn D. Whitehead.

-1-

and not returning a $25,000.00 retainer that the bankruptcy estate either owned outright or, at a minimum, had a claim to.  For the reasons set forth below, a separate order will be issued imposing sanctions upon Ms. Whitehead and Mr. Tamayo.[2]

**1. LEGAL CONTEXT**

The usual rule in bankruptcy cases is that any retainers, "no matter how described, are property of the bankruptcy estate …." *In re Hathaway Ranch P'ship*, 116 B.R. 208, 217 (Bankr. C.D. Cal. 1990) (emphasis added).  *See also, e.g., In re Leff,* 88 B.R. 105, 107 (Bankr. N.D. Tex. 1988) (noting "general rule that pre-petition retainers are property of the estate") (citations omitted).  Alternatively, as argued by Trustee, even if a retainer is not wholly owned by the bankruptcy estate, the estate has been held to have at least a partial interest in the retainer.  *See* Trustee Reply re OSC (dkt. 150) p. 7:1-22 (citing authorities).

These things are not changed simply by the fact that, because chapter 11 debtors sometimes lack the funds to pay a retainer, the funds might come from an insider (a "Funder").  In this Court's experience in other cases, such funding has always been in the form of an equity contribution, and in that situation there is no question that those funds belong to the bankruptcy estate.[3]

True, if the client is *not* in bankruptcy then a Funder might, instead of making an equity contribution, be able to retain full ownership of the funds and therefore the bankruptcy estate might have no cognizable interest in them at all.  Of course, any ownership interest by a Funder in a retainer for a non-Funder client creates a "conflict situation."  Executive Summary to Rule 1.7, Cal. Rule of Prof'l Conduct, p. 1.  But such a funding arrangement nevertheless might be permissible (outside of bankruptcy) if

---

[2] Unless the context suggests otherwise, a "chapter" or "section" ("§") refers to the United States Bankruptcy Code, 11 U.S.C. § 101 et seq. (the "Bankruptcy Code"), a "Rule" means the Federal Rules of Bankruptcy Procedure or other federal or local rule, and other terms have the meanings provided in the Bankruptcy Code, Rules, and the parties' filed papers.

[3] Although an equity contribution still poses an ethical minefield, this Court has approved such equity contributions in some of those other cases, with appropriate safeguards.  *See, e.g., In re 9469 Beverly Crest, LLC* (Case No. 2:19-bk-20000-NB) dkt. 44.

Case 2:23-bk-12137-NB    Doc 160    Filed 05/07/24    Entered 05/07/24 14:04:46    Desc
Main Document    Page 3 of 14

there is full disclosure, no interference with the attorney's duties to the client, and informed written consent including mutual waivers of any conflicts. *See* Cal. Rule of Prof'l Conduct 1.01(e), 1.7 *and* 1.8.6; *and see also* Formal Opinion No. 2013-187 (State Bar of CA, Standing Committee on Prof. Resp. And Conduct) ("Opinion 2013-187"); *Sharp v. Next Ent., Inc.*, 163 Cal. App. 4th 410, 428–29 (2008).

That said, even outside of bankruptcy it would be very dangerous for an attorney to transfer funds held as a retainer to the Funder, rather than the client, unless the client confirms, in writing, that it does not assert any interest in the retainer. Absent such clarity, the attorney should hold or interplead the funds. *See* Opinion 2013-187 pp. 2-3 at n. 5, 10 & 11 & accompanying text.

There is an even greater danger if an attorney transfers a retainer to a Funder without court approval in a chapter 11 case. First, a chapter 11 DIP has the enormous privilege of being trusted with control of the estate, but that privilege comes with the heavy obligation to act as a trustee for the benefit of creditors, including being accountable for all property of the estate. Therefore, the DIP and its professionals must make absolutely sure that property does not belong to the estate before they transfer it without court authorization. *See* §§ 704(a)(2), 1101(1), 1107(a).

Second, it is extremely doubtful that a Funder could provide funding except through an equity contribution. As set forth above, doing so would require waivers to comply with nonbankruptcy law, and a DIP lacks the authority or power to waive conflicts on behalf of creditors. *See, e.g., In re Triple Star Welding, Inc.*, 324 B.R. 778, 791 (9th Cir. BAP 2005), *abrogated on other grounds by In re AFI Holding, Inc.*, 530 F.3d 832 (9th Cir. 2008).

Third, any special funding arrangement for proposed bankruptcy counsel must be authorized by the bankruptcy court. *See* §§ 327(a), 328. Absent such authorization, parties cannot presume that their proposed funding arrangement is operative.

Fourth, even supposing for the sake of discussion that the bankruptcy estate somehow could have *no* interest in a retainer for a DIP's proposed bankruptcy counsel

(a situation this Court has never encountered), at the very least the estate would have a (disputed) claim to the retainer. That claim itself is property of the estate, and any act to exercise control over that claim, or to recover on account of the Funder's countervailing claims, probably (depending on the precise circumstances) would violate the automatic stay. *See* § 362(a)(3)&(6).

In sum, the general rule is that retainers for proposed chapter 11 bankruptcy counsel are property of the bankruptcy estate, or at least property in which the bankruptcy estate shares an interest. If there are any exceptions at all, those exceptions would have to be established by evidence of informed written consent including mutual waivers of any conflicts of interest, which probably would be impossible for a DIP, at least without notice, an opportunity for objections, a hearing, and approval by this Court. Therefore, at the very least the bankruptcy estate has a claim to any retainer, and that claim itself is property of the estate that the DIP and its professionals must be careful not to undermine.

**2. FINDINGS OF FACT**

On April 10, 2023, Debtor filed a voluntary petition under Subchapter V of Chapter 11. On April 11, 2023, this Court issued a Procedures Order (dkt. 8) that, among other things, advised all parties in interest to review the "Procedures of Judge Bason" (the "Procedures"), available at www.cacb.uscourts.gov. *Id.* ¶ 5. Those Procedures state, "[d]eclarations and/or briefs generally are required to address the *ethical concerns involved whenever a retainer is paid by a third party*." Procedures § VII(D)(4) (emphasis added). The Procedures also direct parties to consult, for a further explanation of such ethical concerns, California Rule of Professional Conduct 1.8.6 and *Beverly Crest* (Case No. 2:19-bk-20000-NB, dkt. 44). The Procedures Order was served on Ms. Whitehead (dkt. 14).

In addition, at the outset of this case this Court issued numerous warnings regarding any retainer. For example, prior to a status conference on May 2, 2023 this Court posted a tentative ruling explaining that Debtor's application to employ Ms.

Whitehead (dkt. 22, the "Employment Application") did not adequately disclose the source of the retainer:

> (iv) <u>Retainer from third party funder</u>
> Section 7.2 contains assurances ***that Applicant's retainer came from an (unspecified) source other than Debtor.  That can create conflicts***.  *See* "Procedures of Judge Bason" (posted at www.cacb.uscourts.gov) (search for "retainer").
> But then Debtor's disclosure of compensation (dkt. 1 at PDF p. 44 of 70) ***appears to flatly contradict the assertions in the retainer letter.*** It states that the source of the retainer was Debtor.  *Id.*
> [5/2/23 Tentative Ruling, adopted in Order Denying Employment Application (dkt. 89) at pp. 15–16) (emphasis added).]

This Court issued similar warnings in connection with the status conferences on May 10, 2023 (dkt. 89, p. 12) and May 23, 2023, including the following posted tentative ruling prior to the latter hearing:

> (iii) <u>Ms. Whitehead's decl. (dkt. 69)</u>:  Ms. Whitehead ***fails to provide any declarations of the "Funder"*** (as defined in this Court's prior tentative rulings) ***and of Debtor.***  Nor does Ms. Whitehead answer directly this Court's questions about whether Debtor and the Funder were in fact fully advised about ***potential conflicts***.  Instead Ms. Whitehead relies on vague, hearsay assertions that her pay rate and other matters allegedly "were discussed in writing between the funder, and the Debtor's [unnamed] Director's."  Dkt. 69, attached Memo, p. 3 (PDF p. 6).
> [5/23/23 Tentative Ruling, adopted in Order Denying Employment Application (dkt. 89) at p. 6 (emphasis added).]

Based on the foregoing, this Court finds that Ms. Whitehead was on notice that this Court was concerned about the lack of information concerning whatever funding arrangement might exist between Debtor and Mr. Tamayo, and that there were important unresolved issues about the source of the retainer.  That sets the stage regarding any assertion that she believed the relative interests in the retainer were so clear that she could transfer the retainer without authorization from this Court.

Meanwhile, and more importantly, the way Mr. Tamayo and Ms. Whitehead characterized the retainer kept changing.  Initially they treated Debtor as the source of the retainer, implying that Mr. Tamayo had made an equity contribution.  Shortly thereafter they began alleging that Mr. Tamayo advanced the retainer as a loan to

Debtor. Much later – after Trustee's motion for an OSC pointed out (dkt. 129 p. 4:17-28) that repayment of a prepetition loan would violate the automatic stay (§ 362(a)) – they claimed that the retainer funds belonged entirely to Mr. Tamayo and that the bankruptcy estate had *no* interest in those funds. *See* Trustee Reply re OSC (dkt. 150) pp. 2:21-3:1.

Trustee summarizes the initial allegations of Mr. Tamayo and Ms. Whitehead as follows:

- Dkt. No. 1; Pages 44-46: Ms. Whitehead certifies in her Disclosure of Compensation of Attorney For Debtor that "The source of the compensation paid to me was: **Debtor**".
- Dkt. 1; Page 6: Mr. Tamayo certifies under penalty of perjury that he is one of the Debtor's 20 largest unsecured creditors and is owed $56,738 for "*Monies Loaned / Advanced*".
- Dkt. No. 22; Page 4: Mr. Tamayo and Ms. Whitehead both sign Ms. Whitehead's employment application which states, inter alia, "Ms. Whitehead and the Debtor have executed an Attorney-Client Employment Agreement calling for a retainer in the amount of $25,000.00… of which Ms. Whitehead received the full $25,000.00. Ms. Whitehead also receive [sic] $1,738.00 in prepaid court filing fees **from the Debtor** prior to filing this Chapter 11 case."
- Dkt. No. 22; Page 7: Ms. Whitehead swears under penalty of perjury that "I have had no interest materially adverse to the interest of the estate…."
- Dkt. No. 31; Page 4: Mr. Tamayo swears under penalty of perjury again in Amended Schedule E/F that Vistam owes him $56,738.00 on account of "*Money Loaned / Advanced*".
- Dkt. No. 32; Page 5: Mr. Tamayo swears under penalty of perjury in his Amended Statement of Financial Affairs that the $26,738.00 retainer was a "payment[] of money or other transfer of property made **by the debtor** or person [Mr. Tamayo] acting **on behalf of the debtor**…."
- Dkt. No. 69; Page 5: Ms. Whitehead in her Statement of Disinterestedness states "at the continued 341(a) Hearing, the Debtor's responsible individual stated, in essence, that he funded the proposed counsel's retainer, as well as some other prepetition business expenses, *as a loan to the Debtor* that he hoped to be repaid when the business got back on its feet…."
- May 3, 2023 341(a) Meeting of Creditors at Pages 13-15 (attached to Mr. Flahaut's Declaration filed as Dkt. No. 133): [Mr. Tamayo testifies that his usual practice was to pay lawyers for Debtor and then treat those transactions as **loans from him to Debtor**.] [Trustee Reply re OSC (dkt. 150) pp. 3:26-5:19 (emphasis altered; footnotes omitted).]

As Trustee also points out, the cashier's check for the retainer appears on its face to show that it was purchased by Mr. Tamayo *in his capacity as an officer of Debtor*. *See* Trustee Reply re OSC (dkt. 150) pp. 7:23-8:5. Again, this suggests that

Debtor had either complete ownership or at least shared ownership in the funds (because Mr. Tamayo had either loaned Debtor the funds or made an equity contribution).

At a hearing on May 30, 2023 this Court orally denied the application to employ Ms. Whitehead. Immediately thereafter Ms. Whitehead transferred the retainer to Mr. Tamayo and he accepted and withdrew those funds. Whitehead Decl. (dkt. 146) pp. 8:1-3 & 10:9-12; Tamayo Decl. (dkt. 147) p. 2:14-18.

The timing of this transfer, immediately after the May 30, 2023 hearing, is significant. At that hearing, this Court had made it abundantly clear that Ms. Whitehead might have to turn over possession of the retainer to the bankruptcy estate. As this Court explained:

> I will continue the status conference to June 13 at 1:00 o'clock, with the likelihood of a dismissal between now and then …. The lodged order should reference the local rule that provides for a broad retention of jurisdiction to the maximum extent permitted by law …, but specifically without limiting that, as to Mr. Flahaut's fees, and what the United States Trustee had alluded to—***the potential for disgorgement of Ms. Whitehead's fees.***
> I'm going to be very candid about all this. This is partly to hold an axe over people's head, to try to make sure that people … try to reach a resolution [including] **some way of addressing Mr. Flahaut's fees** …. I don't want to end up with a situation **that essentially rewards the Debtor for not having complied with anything.** It seems to me that if something can be worked out that is not unfair to everyone from [creditors] to Mr. Flahaut … then great. …
> I'm going to deny the Employment Application…. I will continue everything else that is on calendar today …. **Just to keep everything status quo.** [Audio from 5/30/23 hearing, commencing at timestamp 2:04:24 p.m. (emphasis added) (on file with the Clerk of the Court).]

Notwithstanding Ms. Whitehead's knowledge (A) that the retainer was subject to turnover to the estate and (B) that this Court's objective in continuing the hearing was to maintain the status quo as to the retainer (with the aim of ensuring payment of Trustee's fees), she transferred the entire retainer to Mr. Tamayo **immediately after the hearing,** by way of a check sent by overnight mail. Whitehead Decl. (dkt. 95) at ¶ 2.[4] Mr.

---

[4] At a subsequent hearing on June 13, 2023, Ms. Whitehead attempted to characterize her return of the retainer in a more favorable light. She stated: "For the record, at the last hearing, the Court made it

-7-

Tamayo then acted promptly to withdraw the funds, doing so on or about June 1, 2023. *Id.* at ¶ 5 and Ex. B.

The testimony taken at the above-captioned Evidentiary Hearing,[5] as well as the declarations filed by Ms. Whitehead (dkt. 146) and Mr. Tamayo (dkt. 147), further underscore that there is no factual dispute as to what occurred with respect to the $25,000 retainer – the only dispute is what legal consequences flow from the actions taken regarding those funds.[6] Put differently, the testimony of Mr. Tamayo and Ms. Whitehead sets the context but is largely irrelevant to the disputed issues.

Mr. Tamayo's declaration testimony (which describes what occurred more succinctly than his live testimony), provides in relevant part:

> On March 31, 2023, I provided $25,000.00 to Ms. Whitehead from my funds out of love and affection for my elder brother Arley R. Tamayo (the President and Chief Executive Officer of the Debtor), and my sister-in-law Susan V. Tamayo (the Corporate Secretary of the Debtor) for representing them in Debtor's Bankruptcy case with the hope that I could help the company to get back on its feet and it could continue operating and employing people….
> On May 30, 2023, after the Court ruled that Ms. Whitehead could not be employed, she returned the $25,000.00 to me, which she had

---

clear that I was going to not be able to retain the retainer. So on May 31, I returned the full retainer to Mr. Baltazar Tamayo, because it was *his personal property*." Audio of June 13, 2023 hearing commencing at timestamp 2:31:56 p.m. (audio recording maintained by the Clerk of the Court) (emphasis added). This Court has carefully reviewed the audio record of the entire May 30, 2023 hearing (excerpted in substantial part above). At no point during that hearing did this Court issue a ruling regarding the disposition of the funds that had initially been deposited with Ms. Whitehead as a retainer. To the contrary, this Court's remarks made it clear that its objective was to preserve the status quo and that future disgorgement of the retainer was a distinct possibility.

[5] Mr. Tamayo presented live direct testimony at the Evidentiary Hearing and was also subject to cross examination. (His testimony was taken by contemporaneous video transmission from a different location via ZoomGov, pursuant to this Court's order approving remote testimony, *see* dkt. 144.) Although the OSC required direct testimony to be presented by declaration and limited testimony at the Evidentiary Hearing to live cross examination, this Court authorized Mr. Tamayo to present live direct testimony over the objection of Trustee. Because Mr. Tamayo's live testimony was consistent with his declaration testimony, both are referenced herein.

[6] Ms. Whitehead and Mr. Tamayo submitted an unauthorized brief and unauthorized evidentiary objections on the day prior to the evidentiary hearing. *See* dkt. 152–155. Those belated and unauthorized documents are stricken. Alternatively, this Court has carefully reviewed each one of Trustee's evidentiary objections and sustains them in full, but that does not alter any of the determinations in this Memorandum Decision. Alternatively, this Court has considered all of the documents filed by the parties, and all declarations as if they were admissible in evidence, and they do not affect any of the determinations made herein.

received from me pre-petition on or about March 31, 2023. [Tamayo Decl. (dkt. 147) at ¶¶ 4–5.]

At the Evidentiary Hearing, Mr. Tamayo testified that he did not make any demand upon Ms. Whitehead for return of the funds.[7] He also further elaborated upon his reasons for funding the retainer, explaining that he wanted to continue to work for Debtor because it had a much better safety culture than other electrical power contractors he had worked with.[8]

In her declaration,[9] Ms. Whitehead explained her reasons for transferring the $25,000.00 to Mr. Tamayo on May 30, 2023 as follows:

> I am informed and therefore believe that the $25,000.00 funds that were paid to me as a Retainer were Mr. Tamayo's property and not the Debtor's property. The basis of my belief is that after reviewing the Debtor's financial documents, I was informed that these funds could not and did not come from the Debtor's regular income or savings. [Whitehead Decl. (dkt. 146) at ¶ 11.]

All the foregoing testimony elides the core issue. It is undisputed that the $25,000.00 was Mr. Tamayo's property *before* he transferred those funds to Ms. Whitehead. But what matters for purposes of this proceeding is whether the funds retained their character as Mr. Tamayo's property *subsequent to the transfer*, or instead became property of Debtor. Both Mr. Tamayo and Ms. Whitehead did not provide any testimony addressing this issue in connection with the evidentiary hearing, either in their declarations or in live testimony.[10] The only evidence is their prior, somewhat

---

[7] February 6, 2024 evidentiary hearing (audio on file with Clerk of the Court) at timestamp 3:47:24 p.m.

[8] *Id.* at timestamp 3:50:32 p.m.

[9] Ms. Whitehead did not provide live testimony at the evidentiary hearing.

[10] There is nothing in the record indicating that, at the time Mr. Tamayo caused Debtor to retain Ms. Whitehead, or when he transferred the $25,000.00, either he or Ms. Whitehead considered what would happen to the funds if Debtor's application to employ Ms. Whitehead as its general bankruptcy counsel were to be denied. Had Mr. Tamayo or Ms. Whitehead thought about these issues, they could have attempted to grant Mr. Tamayo a contingent reversionary interest in the $25,000, with such interest coming into play upon denial of Debtor's application to employ Ms. Whitehead as its general bankruptcy counsel, or they could have attempted to arrange for the funds to be held in trust for Mr. Tamayo, or some other arrangement. But, of course, the terms of any such proposed interest in the retainer would have to have been fully disclosed in Debtor's application to employ Ms. Whitehead. "A fee applicant must disclose the precise nature of the fee arrangement …. Debtor's counsel must lay bare all its dealings regarding compensation. Counsel's fee revelations must be direct and comprehensive. Coy, or

inconsistent, statements that the source of the funds was Debtor (implying a loan or an equity contribution) and that Mr. Tamayo had treated the retainer as a loan from him to Debtor.

Based on all of the foregoing, this Court finds that the retainer was a loan by Mr. Tamayo, just like his prior loans to fund nonbankruptcy litigation. As with any loan, the funds became property of the bankruptcy estate, and Mr. Tamayo had only a prepetition claim to be repaid the dollar amount that he had advanced.

Alternatively, supposing for the sake of discussion that the nature of the retainer was indeterminate (which it was not), this Court finds that Mr. Tamayo and Ms. Whitehead did not contemplate, when he transferred the retainer funds to her, that the funds would be held in trust for him, or that the bankruptcy estate would otherwise lack *any* interest in or claim to those funds. In other words, there was not even an intent, let alone a binding contractual arrangement, for the bankruptcy estate to have absolutely no interest in the funds.

Alternatively, supposing for the sake of discussion that they harbored some hidden intent that the bankruptcy estate should not have any interest in those funds (an intent for which there is no persuasive evidence at all), this Court finds that they were well aware that the nature of the retainer was disputed and that this Court *could* find that it was an equity contribution or a loan, and therefore that the bankruptcy estate either owned those funds or, at the very least, had a claim to them, which claim is also property of the estate.

---

incomplete disclosures are not sufficient." *In re Park-Helena Corp.*, 63 F.3d 877, 881 (9th Cir. 1995) (cleaned up, including by omitting internal quotations marks and citations).

It is highly doubtful that an employment application containing such a fee arrangement could ever be approved as being "in the best interests of the bankruptcy estate." *Park-Helena*, 63 F.3d 887, 880. For the reasons explained at the start of this Memorandum Decision, such an arrangement would create conflicts of interest that probably could not be waived.

But the key point is that if Mr. Tamayo or Ms. Whitehead had truly intended for Mr. Tamayo to have exclusive rights to any unspent retainer funds, such that the bankruptcy estate would have *no* interest in or claim to such funds, they would have had to disclose that intent at the inception of this bankruptcy case. The fact that they did not supports this Court's finding that they had no such intent.

In sum, this Court finds that Mr. Tamayo and Ms. Whitehead both knew that the retainer funds were subject to asserted property interests of the bankruptcy estate.  This Court finds that when Ms. Whitehead unilaterally transferred the retainer funds to Mr. Tamayo, she knowingly and willfully did so despite these property interests of the bankruptcy estate.  Likewise, when Mr. Tamayo accepted that transfer, he knowingly and willfully did so despite the bankruptcy estate's property interests.

### 3. JUDICIAL ESTOPPEL

Alternatively, judicial estoppel prevents Ms. Whitehead and Mr. Tamayo from changing their story, after having obtained months of delay and protection from creditors in this bankruptcy case before this Court finally denied the application to employ Ms. Whitehead and then dismissed this case with a 180-day bar.  As summarized by Trustee:

> "Judicial estoppel, sometimes also known as the doctrine of preclusion of inconsistent positions, precludes a party from gaining an advantage by taking one position, and then seeking a second advantage by taking an incompatible position." *Rissetto v. Plumbers and Steamfitters Local 343*, 94 F.3d 597, 603 (9th Cir. 1996). "[J]udicial estoppel focuses exclusively on preventing the use of inconsistent assertions that would result in an affront to judicial dignity and a means of obtaining unfair advantage. The doctrine is intended to protect against a litigant playing fast and loose with the courts by asserting inconsistent positions." *Rockwell Intern Corp. v. Hanford Atomic Metal Trades Counsel* 851 F.2d 1208, 1210 (9th Cir. 1988) (internal quotations and citations omitted for brevity).  [Trustee Reply re OSC (dkt. 150) p. 3:12-20.]

Had this Court known at the inception of this bankruptcy case that Mr. Tamayo and Ms. Whitehead would allege that the bankruptcy estate had no interest in or claim to the retainer, this Court would have immediately informed them that Ms. Whitehead could not be employed and that if Debtor did not arrange a different method of financing its retention of bankruptcy counsel then this case would have to be dismissed.  *See, e.g.,* the *Beverly Crest* (Case No. 2:19-bk-20000-NB, dkt. 44).  Instead, in reliance on the lack of immediate disclosure of those things, this Court allowed this bankruptcy case to proceed and allowed Ms. Whitehead to continue appearing as proposed counsel for Debtor.

The point, for purposes of these contempt proceedings, is that Ms. Whitehead and Mr. Tamayo knew full well that they were taking inconsistent positions, and therefore they could not have believed that they could freely transfer the retainer funds without a risk that those funds would be found by this Court to be funds in which the bankruptcy estate could assert an interest or at least a claim. Put differently, they acted knowingly and willfully in transferring, receiving, and not returning funds that they knew were subject to asserted property interests of the bankruptcy estate.

**4. MS. WHITEHEAD AND MR. TAMAYO LACKED ANY OBJECTIVELY REASONABLE BASIS TO DOUBT THE SCOPE OF THE AUTOMATIC STAY**

Ms. Whitehead argues that a contempt sanction is not warranted because when she transferred the funds to Mr. Tamayo on May 30, 2023, she believed "it was the ethical and right thing to do." Whitehead Decl. (dkt. 146) at ¶ 6. For purposes of civil compensatory contempt, what matters is not Ms. Whitehead's *subjective* beliefs but instead whether there was an "objectively reasonable basis" for Ms. Whitehead's conclusion that return of the funds to Mr. Tamayo would be lawful if, as she knew could be the fact, the bankruptcy estate had any cognizable interest in the retainer. *Taggart v. Lorenzen*, 139 S. Ct. 1795, 1799 (2019). This Court has little difficulty in determining that there was no objectively reasonable basis for Ms. Whitehead to believe that her actions were consistent with the automatic stay.

The automatic stay prohibits any act "to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." § 362(a)(3). By transferring the retainer, she knew she was acting to obtain possession of property that this Court might find (and now has found) is property of and from the estate. She also knew that she was acting to exercise control over – to transfer away – property that this Court might find (and now has found) is property of the estate.

In addition, the automatic stay prohibits "any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the [bankruptcy] case." § 362(a)(6). Ms. Whitehead knew that she was transferring funds to Mr.

Tamayo on account of what this Court might find (and now has found) was a prepetition loan. She lacked an objectively reasonable basis to believe that the scope of § 362(a)(6) was too narrow to encompass her conduct.

Likewise, when Mr. Tamayo acted to take possession of the funds from Ms. Whitehead, he knew that he was accepting funds that he himself had inconsistently described as a loan (or alternatively an equity contribution to Debtor). Therefore, he lacked an objectively reasonable basis to believe that the scope of § 362(a)(3) and (a)(6) would not cover his acts.

In sum, a finding of civil contempt is appropriate because Ms. Whitehead and Mr. Tamayo violated the automatic stay based on "an objectively unreasonable understanding of the [automatic stay or] its scope." *Taggart,* 139 S.Ct. 1795, 1802.

## 5. CIVIL COMPENSATORY CONTEMPT SANCTIONS ARE WARRANTED

For the foregoing reasons, this Court will issue a separate order imposing a compensatory civil contempt sanction upon Ms. Whitehead and Mr. Tamayo, jointly and severally, in the amount of $39,892.00, plus additional attorney fees incurred by Trustee in an amount to be determined. The sanction consists of (A) $25,000.00 that is property of the estate and therefore should have been transferred not to Mr. Tamayo but to the bankruptcy estate – *i.e.,* to Trustee as representative of the estate (now that Debtor is no longer the DIP), (B) $14,892.00 in attorney fees incurred by Trustee as of November 21, 2023 to vindicate the bankruptcy estate's rights in those funds, and (C) attorney fees incurred by Trustee subsequent to November 21, 2023. The order will direct Ms. Whitehead and Mr. Tamayo to pay the $39,892.00 sanction to Trustee no later than **21 days after that order is entered on the docket**.

This Court contemplates that the order will set a **deadline of May 14, 2024** for Trustee to file and serve a supplemental declaration containing daily time records supporting fees incurred subsequent to November 21, 2023, a **deadline of May 28, 2024** for any opposition, and a **deadline of June 4, 2024** for any reply. Unless otherwise ordered, no hearing will be held in connection with the supplemental

declaration; instead, this Court anticipates reviewing the declaration and other papers, determining if the requested fees are reasonable and arise from this dispute, and issuing an appropriate order.

### 6. CONCLUSION

This situation is unfortunate but it could have been avoided if Ms. Whitehead and Mr. Tamayo had been more forthcoming and consistent in response to their obligations to disclose their proposed funding arrangements.  For all the reasons set forth above, this Court will issue a separate order sanctioning Ms. Whitehead and Mr. Tamayo. They are cautioned that additional or different coercive measures might be imposed in future, if necessary to compel turnover of the funds they wrongfully transferred and reimbursement of Trustee's attorney fees.

###

Date: May 7, 2024

Neil W. Bason
United States Bankruptcy Judge